IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

**NÉLIDA MÉNDEZ-SOTO**,

   Plaintiff,

   v.

**MICHAEL J. ASTRUE**, Commissioner of the
Social Security Administration,

   Defendant.

Civil No. 11-1935 (BJM)

**OPINION AND ORDER**

Nélida Méndez-Soto ("Méndez") seeks review of a decision by the Commissioner of the Social Security Administration finding that she was not disabled prior to January 25, 2006, under sections 216(i) and 223(d) of the Social Security Act, 42 U.S.C. §§ 416(i) and 423(d). (Docket No. 1). The Commissioner answered the complaint (Docket No. 11) and filed a memorandum of law in support of his position (Docket No. 24, hereinafter "Def. Mem."). Méndez also filed a memorandum of law in support of her position. (Docket No. 21, hereinafter "Pl. Mem."). The parties have agreed to have the case heard before me. (Docket Nos. 4, 5). For the reasons that follow, the Commissioner's decision is **vacated** and **remanded**.

**STANDARD OF REVIEW**

The court's review is limited to determining whether the Commissioner and his delegates employed the proper legal standards and found facts upon the proper quantum of evidence. Manso-Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 15, 16 (1st Cir. 1996). The Commissioner's findings of fact are conclusive when supported by substantial evidence, 42 U.S.C. § 405(g), but are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts. Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999); Da Rosa v. Sec'y, 803 F.2d 24, 26 (1st Cir. 1986); Ortiz v. Sec'y, 955 F.2d 765, 769 (1st Cir. 1991).

The court "must affirm the [Commissioner's] resolution, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." Rodríguez Pagán v. Sec'y, 819 F.2d 1, 3 (1st Cir. 1987). Written reports submitted by non-examining physicians who merely reviewed the written medical evidence are not substantial evidence, although these may serve as supplementary evidence for the Commissioner to consider in conjunction with the examining physician's reports. Irizarry-Sanchez v. Comm'r, 253 F. Supp. 2d 216, 219 (D.P.R. 2003).

A claimant is disabled under the Act if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Under the statute, a claimant is unable to engage in any substantial gainful activity when she "is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). In determining whether a claimant is disabled, all of the evidence in the record must be considered. 20 C.F.R. § 404.1520(a)(3).

The Commissioner must employ a five-step evaluation process to decide whether a claimant is disabled. 20 C.F.R. § 404.1520; see Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987); Goodermote v. Sec'y, 690 F.2d 5, 6-7 (1st Cir. 1982). In step one, the Commissioner determines whether the claimant is currently engaged in "substantial gainful activity." If so, the claimant is not disabled. 20 C.F.R. § 404.1520(b). At step two, the Commissioner determines whether the claimant has a medically severe impairment or combination of impairments. 20 C.F.R. § 404.1520(c). If not, the disability claim is denied. At step three, the Commissioner must decide whether the claimant's impairment is equivalent to an impairment already determined to

be so severe as to preclude substantial gainful activity. 20 C.F.R. § 404.1520(d); 20 C.F.R. pt. 404, subpt. P, App. 1. If the claimant's impairment meets or equals one of the listed impairments, she is conclusively presumed to be disabled. At step four, the ALJ determines whether the impairment prevents the claimant from performing the work she has performed in the past. If the claimant is able to perform her previous work, she is not disabled. 20 C.F.R. § 404.1520(e). If she cannot perform this work, the fifth and final step asks whether the claimant is able to perform other work available in the national economy in view of her residual functional capacity, as well as age, education, and work experience. If the claimant cannot, then she is entitled to disability benefits. 20 C.F.R. § 404.1520(f).

The burden is on the claimant to prove that she is disabled within the meaning of the Social Security Act. See Bowen, 482 U.S. at 146-47 n.5. At steps one through four, the claimant has the burden of proving that she cannot return to her former employment because of the alleged disability. Santiago v. Sec'y, 944 F.2d 1, 5 (1st Cir. 1991). Once a claimant has demonstrated a severe impairment that prohibits return to her previous employment, the Commissioner has the burden under step five to prove the existence of other jobs in the national economy that the claimant can perform. Ortiz v. Sec'y, 890 F.2d 520, 524 (1st Cir. 1989).

### FACTUAL AND PROCEDURAL BACKGROUND

The procedural history and relevant facts of the case are set forth below. Because the medical evidence is voluminous and plaintiff's argument is narrow, I only summarize the records highlighted by the parties.

*Procedural Overview*

Méndez was born on July 20, 1963, has at least a high school education, is unable to communicate in English, and previously worked as a sewing machine operator. (Tr. 28). She claims a disability onset date of June 4, 2004 (age 40) due to fibromyalgia, discogenic disease,

and major depression. (Tr. 112). Méndez has not worked since June 2004, and she was last insured for Social Security benefits on September 30, 2008. (Tr. 26, 108, 112).

Méndez applied for disability and disability insurance benefits on April 4, 2005. Her claim was denied at the initial and reconsideration stages. An ALJ hearing was held on May 21, 2009; Méndez waived her right to appear and testify, and was represented by an attorney. (Tr. 24). A partially favorable decision and written opinion issued June 9, 2009. (Tr. 16, 30). The Appeals Council denied Méndez's request for review on July 22, 2011. (Tr. 7).

*Medical History*

On June 10, 2004, Dr. Wanda I. Benitez completed a State Insurance Fund (SIF) radiological report on Méndez, indicating straightening of the cervical spine, narrowing of the C4-C5 and C5-C6 disc spaces, and the presence of "anterior posterior osteophytes" at the same levels. Dr. Benitez stated an opinion of muscle spasm, discogenic changes, and spondylosis. (Tr. 598). A June 24, 2004 electromyographic examination from an outside office suggested "left carpal tunnel syndrome of *mild severity* at present." (Tr. 597) (emphasis in original). Progress notes from the SIF Mayagüez Region outpatient clinic on July 21, 2004 describe Méndez as subjectively "[s]table, with pain in the neck, right arm and left arm, radiating to the coccyx," and a complaint of not being able to sit for long periods. (Tr. 591).

An August 10, 2004 progress note describes a complaint that Méndez had "not slept in the past few days," that she was depressive but with no delusions found, and that she was "[a]lert, active, cooperative, spontaneous, logical, coherent[,] and relevant." (Tr. 581). On August 17, another progress note repeats that she does not sleep, with no delusions but "slightly nervous [and] anxious." (Tr. 579). The psychologist recommended she be referred to a psychiatrist. (Id.).

By September 13, 2004, SIF progress notes reflect a complaint that her pain was worse, as well as objective chronic pain. (Tr. 570-74). Méndez underwent an initial psychiatric evaluation with Dr. Carmen Cotto on that date. (Tr. 563). The corresponding report indicated that the claimant had an accident on June 8, 2004, and that the onset of her emotional condition was July 21, 2004. (Id.). Dr. Cotto noted that Méndez complained of sadness, irritability, apathy, loss of appetite, memory and concentration problems, poor tolerance to noise, nervousness, physical-motor sluggishness, tremors, breathing difficulty, tiredness and the feeling that needles were penetrating her skin. (Tr. 563-64). With respect to Méndez's daily schedule, she woke up several times each night, she could do limited household chores, and she could take care of her personal care needs with help. (Tr. 565-66). In evaluating her mental state, Dr. Cotto described her attitude and behavior as cooperative and dramatic, her motor activity as involving excessive gestures and limitation of movements, her mood and affect as depressed and anxious with appropriate affect, and her language as pressured. (Tr. 566). Dr. Cotto drew attention to Méndez's reports of suicidal ideas without attempts, nightmares, delusions, hearing of voices and hallucinations. (Tr. 567). With respect to the delusions, Méndez stated that "needles came out of the machine" and went into her upper right extremity and Dr. Cotto mentioned that the claimant touched that area a significant amount. (Id.). Relative to the hallucinations, the claimant stated that the voices "ordered her to kill herself." (Id.). In examining her cognitive functions, Dr. Cotto found her to be oriented, have preserved memory, have a satisfactory attention span and concentration, have normal intellect, and to have fair insight and fair judgment. (Id.). Dr. Cotto diagnosed Méndez with Major Depression Disorder with Psychotic Features, gave her a guarded prognosis, prescribed her with Paxil, Prosom, Klonopin, Abilify and recommended she rest (as opposed to work) and return for treatment within the month. (Tr. 567-68).

A September 14, 2004 MRI consultation reported an impression of "grade I degenerative disk changes at L3-L4 with a small central bulging disk." (Tr. 556).

At the beginning of October 2004 Méndez's psychiatrist described her as alert and oriented, suffering from persecution ideas, hallucinations and delusions, and as acting somewhat dramatic. (Tr. 555). The psychiatrist noted that Méndez was slightly disconnected from reality and that she had not improved. (Id.). She continued taking prescription medication and the psychiatrist recommended that she remain at rest. Id.

An October 4, 2004 medical report states that Méndez has neck and lower back pain, radiating through her right leg and to her ankle. (Tr. 552). An October 14, 2004 report ruled out fibromyalgia as a diagnosis. (Tr. 546). An October 26, 2004 progress note states that she claims none of the treatments take the pain away; the doctor "gave her an order for blocks." (Tr. 543). A special medical report on December 23, 2004 states that an "[i]njection did NOT help," and that Méndez reported being unable to move her arms, numbness in her hands, and pain in the lateral region of her arms. (Tr. 533).

A January 13, 2005 progress note states that an anesthesiologist "recommended a Cervical MRI and an EMG/NCV of the upper extremities." (Tr. 523). An MRI reported January 14, 2005 found a central disc protrusion touching the ventral spinal cord at C2-C3, a small left paracentral disk protrusion touching the ventral spinal cord at C3-C4, and a large central disk protrusion indenting the central spinal cord at C5-C6. (Tr. 517).

On January 25, 2005, a progress note discharging her reported Méndez's complaints about "see[ing] machines and hear[ing] voices," and about her physical condition. She was described as "alert, oriented and organized," "casually dressed," coherent, and denying suicidal or homicidal ideas. (Tr. 506). The note's author remarked that Méndez "dramatizes her condition and I think that she exaggerates a little. After complaining with a depressed affect, she

talks and asks about Christmas with a smile on her face. She does an analysis of her situation of bad use of services with good judgment." (Id.).

A February 15, 2005 progress note observed Méndez in "chronic pain, with poor response to the treatment she has received." (Tr. 498).

On April 5, 2005, Méndez was admitted to the Mepsi Center in Bayamón, and was discharged on April 13. Her diagnosis was "[m]ajor depression with suicidal ideas and attempt and psychotic features in partial remission." (Tr. 182). A summary document states that for two weeks, Méndez had been suffering from:

> [D]epressed mood, suicidal ideas, aggressiveness, paranoid delusions, she was responding to internal stimuli, illogical thought, recent suicidal attempt, hopelessness, isolation, poor tolerance, irritability, apathy, anhedonia, visual and auditory hallucinations[,] self-deprecation, disruptive and disorganized behavior, anxiety, [and] poor impulse control. The patient wanted to jump in front of cars to be run over and she heard voices and saw shadows[;] she tried to kill herself. She has previous psychiatric treatment.

(Tr. 186). Her GAF on release was assessed as between 60 and 65. (Id.). The Mepsi Center referred her to the Centro de Salud Conductual del Oeste ("CSCO") in Mayagüez (Tr. 174).

In a November 1, 2005 SIF progress note, Méndez reported pain in the cervical area notwithstanding a September 29 surgery, and an inability to extend her right arm forward. (Tr. 459).

On January 25, 2006, Dr. Armando Caro performed a psychiatric evaluation of Méndez, finding "[m]arked psychomotor retardation," depressed mood, blunted affect, and "fair" eye contact, but with no delusions, hallucinations, or suicidal/homicidal ideations. Her speech was "fluent, coherent, and logical." She was oriented in person and place, but "only partially oriented in time," and had impaired concentration, immediate memory, and short-term memory. She had fair remote memory, but preserved recent memory. Her abstract thinking was impaired, and she had poor judgment and insight. Dr. Caro found a GAF of 50-55, and concluded she "has

**no** capacity to handle her own funds. The capacity for social interaction is impaired based on the patient[']s interaction with this interviewer. Her prognosis is poor." (Tr. 399) (emphasis in original).

On March 2, 2006, Dr. Luis Umpierre reviewed Méndez's file and provided a mental RFC and Psychiatric Review Technique Form (PRTF). (Tr. 409-27). His RFC and PRTF indicated that Méndez had a moderate condition. (Tr. 409). He rated her functional limitations as "moderate" for the categories of restriction of daily living activities, difficulties in maintaining social functioning, difficulties in maintaining concentration, persistence or pace, and he found she had experienced one or two episodes of decompensation. (Tr. 424). Dr. Umpierre found that Méndez had a depressive syndrome that was not characterized by delusions or hallucinations. (Tr. 416). He indicated that she had psychomotor retardation, affected concentration and immediate memory, was in contact with reality, had organized thought processes and no perceptual or thought disorder. (Tr. 412). He stated that "[o]verall claimant retain[s] the capacity to engage in simple social interactions, sustain concentration for two hour interval[s] when dealing with simple non demanding task [sic]. Can adjust to minor work changes and make simple day to day decisions." (Id.)

On March 14, 2006, Dr. Aciscio Maruxach performed a physical RFC based on the record. (Tr. 429-37). Méndez's condition was labeled "severe," but she was rated as able to occasionally lift or carry up to 20 pounds, able to frequently lift and or carry up to ten pounds, able to both sit and stand for about 6 hours in an 8-hour work day, and able to perform unlimited pushing and pulling. (Tr. 429, 431). She was rated as able to occasionally climb, kneel, and crouch, and frequently balance and kneel. Dr. Maruxach found no established manipulative visual, communicative, or environmental limitations. (Tr. 433-35). Later, in September 2007, another doctor adopted this assessment. (Tr. 650).

Dr. Ronald Malavé, a CSCO doctor, completed a mental impairment assessment on behalf of Méndez on March 24, 2006. (Tr. 440-443). In this report he indicated that Méndez's first visit was on April 5, 2005, and that her last visit had been on March 3, 2006, during which time he saw her approximately every one to three months. (Tr. 440). Dr. Malavé indicated that the report applied to the entire period of time that he treated Méndez. (Tr. 443). He identified her signs and symptoms as: anhedonia, decreased energy, feelings of guilt or worthlessness, mood disturbance, difficulty concentrating, psychomotor retardation, emotional withdrawal and isolation, easy distractibility and sleep disturbance. (Id.). He diagnosed her as having 296.33 DSM-IV TR (Major Depressive Disorder, Recurrent, Severe Without Psychotic Features) and gave her a guarded prognosis. (Tr. 441). He indicated that she was being treated with pharmacotherapy along with individual and supportive therapy, to which she had exhibited a partial response. (Id.). Relative to her functioning capacity, he indicated that she was moderately limited in remembering work-like procedures and understanding and remembering very short and simple instructions, and markedly limited in understanding and remembering detailed instructions. (Id.). He found that she was markedly limited in maintaining her attention and concentration for extended periods. (Id.). Dr. Malavé also determined that she was moderately limited in maintaining regular attendance and making simple work-related decisions, while she was markedly limited in sustaining an ordinary routine without special supervision, working in close proximity to others without being unduly distracted, completing a normal workday and week without interruptions from psychologically based symptoms, and performing at a consistent pace without an unreasonable number and length of breaks. (Id.). With respect to social interaction, Dr. Malavé found that she would be markedly limited in accepting instructions and responding appropriately to criticism from supervisors and getting along with colleagues without distracting them or exhibiting behavioral extremes. (Id.). With respect to adaptation to

change, stress and danger in the workplace, he found she was moderately or markedly limited in all areas. (Id.). Dr. Malavé expected that Méndez would be absent from work due to her impairments approximately three days per month. (Id.). Finally, he believed she could manage benefits in her own best interest. (Tr. 443).

On January 29, 2007, an MRI of the cervical spine concluded she had "[p]atrial cervical fusion of the C2-C3 vertebral body and complete fusion of the C6-C7 vertebral body," a small central disc protrusion at C3-C4, a large broad-based central disc protrusion at C5-C6, and "[n]o involvement of the intervertebral foramina." The studying doctor also found "[m]ild stenosis of the spinal canal" at C5-C6. (Tr. 448).

Dr. Malavé evaluated Méndez again in April 2007. (Tr. 609-617). He described her signs and symptoms as: "depressed, anhedonia, insomnia, anxiety, lack of energy, lack of concentration and feelings of hopelessness." (Tr. 609). The treatment plan included pharmacotherapy and individual and supportive psychotherapy. (Id.). He found her behavior to be tense, with motor retardation, her affect and mood to be depressed, and her thought process to be coherent, relevant and logical without suicidal or homicidal ideas. (Tr. 616). He indicated that she was oriented in three spheres, had poor attention and concentration, had preserved memory, good judgment, and moderate insight. (Tr. 617).

Dr. Malavé completed a mental RFC on behalf of Méndez on June 13, 2007. (Tr. 618-22). Dr. Malavé checked the box indicating that the description of Méndez's symptoms and limitations in the form applied to the time period between April 5, 2005, and June 13, 2007. (Tr. 621). With respect to the mental abilities and aptitudes needed to do unskilled work, Dr. Malavé found Méndez unable to meet competitive standards in eleven areas: remembering work-like procedures, maintaining attention for two hour segments, maintaining regular attendance and being punctual, sustaining an ordinary routine without special supervision, working in

coordination with or proximity to others without being unduly distracted, completing a normal workday and workweek without interruptions from psychologically based symptoms, performing at a consistent pace without an unreasonable number and length of rest periods, accepting instructions and responding appropriately to criticism from supervisors, getting along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, responding appropriately to changes in a routine work setting, and dealing with normal work stress. (Tr. 619). Dr. Malavé found Méndez to be seriously limited in five areas: understanding and remembering very short and simple instructions, carrying out very short and simple instructions, making simple work-related decisions, asking simple questions or requesting assistance, and being aware of normal hazards and taking appropriate precautions. (Id.). He explained that Méndez's psychiatric condition and medical problems were responsible for the limitations on her functional state. (Id.). Dr. Malavé indicated that, with respect to the mental abilities and aptitudes needed to do semi-skilled and skilled work, Méndez was unable to meet all competitive standards. (Id.). Relative to the mental abilities and aptitudes needed to do particular types of jobs, he found Méndez was seriously limited but not precluded in social interaction and cleanliness categories, but unable to meet competitive standards in the travel to unfamiliar places and use of public transport categories. (Tr. 620). Dr. Malavé stated that Méndez's psychiatric condition exacerbated her severe chronic pain condition. (Id.). In terms of functional limitations, he described her as moderately limited in performing daily living activities, and found that she had marked difficulties in maintaining social functioning along with marked deficiencies of concentration, persistence or pace. (Id.). He indicated that she had suffered one or two episodes of decompensation in a twelve month period. (Id.). He anticipated that she would be absent from work approximately four days per month due to her symptoms. (Tr. 621). He also believed she could manage her benefits. (Tr. 622). Finally, he indicated that Méndez had a medically

documented history of a mental or affective disorder of at least two years' duration that caused more than a minimal limitation of ability to do basic work activity that was further attenuated by "[a] residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate." (Tr. 621).

Dr. Dominga Pichardo completed a treatment summary of Méndez on June 4, 2007. (Tr. 606). She indicated that the claimant's clinical picture consisted of chronic back pain (cervical and lumbar), cephalea, depression/anxiety, and gastritis/psychosis, for which Méndez was being treated with Lyrica, Parafrom and physical therapy. (Tr. 605-606). Dr. Pichardo described the course of the illness in the following way: "The patient's clinical picture has worsened. The pain persists and she has changing emotions (anxious, depressed, insomnia)." (Tr. 606). Dr. Pichardo's diagnostic impression of Méndez was rheumatic fibromyalgia, depression, anxiety, psychosis, discogenic disease, muscle spasm, tendinitis and spondylosis. (Id.).

A psychiatric evaluation performed by Dr. Alberto Rodríguez Robles, M.D., on September 11, 2007 addressed her complaint of depression. (Tr. 656). Dr. Rodríguez observed her as "tearful, depressed, and with psychomotor retardation," restricted affect, depressive mood, and average intellectual capacity. He described her thought as "slow, logical, coherent[,] and relevant," but expressed concern over "ideas of worthlessness, abandonment[,] and hopelessness." He found no perceptual disorders, but diminished attention and concentration. Her memory was adequate, insight fair, judgment adequate, and she was oriented in three spheres. He rendered a poor prognosis and found her unable to handle funds. (Tr. 658-59).

On September 12, 2007, the SSA sent non-treating state agency psychologist Dr. Luis Rodriguez a request to review Méndez's file. (Tr. 661). The request included a brief summary of the medical evidence in the file and a suggestion that the prior mental RFC assessment be

adopted. (Id.). The summary did not indicate on which date the prior RFC had been performed nor did it indicate which doctor had performed it. (Id.). On October 4, 2007, Dr. Rodriguez stated that he had adopted the previous PRTF-MRFC. (Tr. 662).

*Vocational Expert Testimony*

The ALJ took the testimony of an impartial vocational expert during the hearing, posing two hypothetical questions. (Tr. 24, 678-83). The ALJ first told the expert to assume an individual with the same occupational experience as Méndez and who was the same age: (1) could physically only perform sedentary work, (2) could mentally only perform simple repetitive tasks, and (3) these tasks would be performed without contact with the public and with a maximum of occasional contact with supervisors and co-workers. (Tr. 679-80). The VE testified that under those conditions, the claimant could not perform her former work, but that she could perform the occupations of classifier, product inspector, ticket labeler and hand packer. (Tr. 680-81). Second, the ALJ asked the expert to assume the same limitations as the first hypothetical, with an additional restriction that the individual would only be able to work for a maximum of less than two hours at a time and would need to rest for ten minutes at the end of each working period, and would repeat this pattern over the course of an eight-hour workday. The VE testified that the claimant could not do any jobs under those circumstances. (Tr. 682-83).

Méndez's attorney also posed two hypotheticals to the VE. (Tr. 683-687). First, the attorney asked the expert to assume an individual who: (1) had moderately severe pain in the right shoulder, and consequently had a markedly limited use of that dominant arm when performing repetitive tasks for more than five or ten minutes; (2) had a neck condition that led to a discectomy, but continued to suffer from this condition, thus limiting her from working in a fixed position or rotating her head; (3) had a limited ability to perform simple tasks due to difficulties with concentration; (4) had depression and anxiety that did not allow her to remain

seated, to stand or to walk for over two hours; and (5) had headaches that lasted a few hours approximately four times per week and as a result would be absent from her job at least once a week. (Tr. 684-85). The expert testified that under those conditions, the claimant could not perform her former work or any another job, and that these restrictions would place her outside the job market. (Tr. 686).  Second, Méndez's attorney asked the expert to assume a person who had all the previously mentioned limitations and also: (1) had been undergoing psychiatric treatment for a major and severe depressive disorder with psychotic traits; (2) had markedly limited concentration and could not maintain her attention for even a half hour, regardless of how simple a task might be; and (3) had inappropriately irritable reactions to supervision in the workplace, thus disrupting the work environment.  (Tr. 686-87). The VE testified that these would be very restrictive conditions and such a person could not perform any occupation. (Id.).

*Written ALJ Opinion*

The ALJ determined that Méndez was insured through September 30, 2008.  (Tr. 26).  At step one of the disability analysis, the ALJ found she had not engaged in substantial gainful activity since her alleged onset date.  (Id.).  At step two, he found she had "degenerative disc disease at the cervical level with surgery at C6-7, chronic pain, [and] depression."  (Id.).  At step three, he found no listing-level impairment.  (Id.).

In his residual functional capacity ("RFC") analysis, the ALJ determined that prior to January 25, 2006, Méndez could perform "sedentary work," but was "limited to simple repetitive tasks, no contact with [the] public[,] and only occasional contact with peers and supervisors," and that she was "moderately limited in all areas of functioning and has had one episode of decompensation."  (Tr. 27).  He found that her medically determinable impairments "could reasonably be expected to produce the alleged symptoms," but discredited her statements about

their "intensity, persistence, and limiting effects" prior to January 25, 2006. (Id.). The ALJ explained:

> The undersigned has relied on the evidence provided by the State Insurance Fund, Mepsi Center and Dominga Pichardo, MD her treating physician to conclude that her allegations regarding the degree of limitations caused by the health conditions is not fully credible.
>
> . . .
>
> In terms of the claimant's alleged limitations her conditions were being treated and the findings were not as severe as alleged. None of the treating sources concluded that she could not work based on objective facts.
>
> In sum, the above residual functional capacity assessment is supported by the evidence gathered from treatment at the State Insurance Fund for all her physical and psychiatric problems, record of hospitalization at Mepsi Center in April 2004, operative record at Doctor's Hospital in September 2004, treatment notes from Dr. Dominga Pichardo, treatment notes from Centro de Salud Conductual del Oeste (CSCO) as well as forms completed by Ronald Malavé, MD. Notice is also taken of consultative exams performed by Alfredo Perez Canabal, MD and Samuel Mendez, MD that report minimal findings.

(Tr. 27-28) (punctuation as in original). As for the period after January 25, 2006, the ALJ found that Méndez's RFC was "further limited to work at minimally acceptable levels of production for [a] maximum of less than 2 hours followed by [a] minimum break of ten minutes, this pattern [being] repeated throughout the 8 hour workday." (Tr. 28). The ALJ explained that after that date, her "allegations regarding her symptoms and limitations are generally credible . . . based on the consultative exam performed by Armando Caro, MD on that date," and that her physical condition "had not shown significant improvement after the surgery." He found Dr. Caro's opinion to be supported by Dr. Alberto Rodríguez Robles's consultative exam, and Dr. Malavé's forms "to the effect that her psychiatric problem had deteriorated, further limiting her residual functional capacity for work." (Id.).

At step four, the ALJ found Méndez could not perform her past relevant work because her RFC was "less than sedentary" after her alleged onset date, while her only relevant work was

as a sewing machine operator with medium exertional requirements. (Tr. 28). Méndez was forty years old at her alleged onset, placing her in the 18-44 age category; has a high school education; and cannot communicate in English. (Id.). The ALJ found she did not have transferrable job skills after January 25, 2006, and made no job skill determination for the period prior to that date. (Id.). Based on the vocational expert's testimony, the ALJ found there was a significant number of jobs in the national economy that Méndez could perform at her pre-January 25 RFC, but that her additional limitations after January 25 did not allow a significant number of jobs. (Tr. 29-30). The ALJ concluded that Méndez became disabled on January 25, 2006. (Tr. 30).

## DISCUSSION

Méndez's brief advances at least one ascertainable thread:[1] the ALJ did not explain *why* he chose not to give controlling weight to certain medical findings by Dr. Malavé regarding Méndez's condition during the period before January 25, 2006. (Pl. Mem. at 13-21). Had weight been given to Dr. Malavé's findings, Méndez hypothesizes that her pre-January 25 RFC would have included additional mental limitations—specifically, "marked limitations in his [*sic*] ability to pay attention and concentration, and also psychomotor retardation, also markedly in to complete a normal workday or work week, or perform at a consistent pace and accept instructions and criticism from supervisors." (Pl. Mem. at 14) (emphasis omitted). With a more

---

[1] Méndez's brief is repetitive, unstructured, and overall quite difficult to parse. It appears to advance two other positions, neither of which merit extensive discussion. First, Méndez claims that "the ALJ substituted the treating psychiatrist opinions, with his own opinion." (Pl. Mem. at 24) (formatting omitted, *sic* throughout). However, she only substantiates this point with the same reasoning underlying her attack on the ALJ's RFC determination, discussed *infra*. No separate consideration of this point is necessary.
  Second, she claims that "[t]he ALJ made the finding, that since the alleged onset date, the claimant has not had an impairment or combination of impairments that met or medically equal one of the listed impairments (20 C.F.R. Part 404, Subpart P, Appendix 1). Consequently we understand that the ALJ by making such a finding, ignored the medical reports and medical findings of the claimant's treating and examining physicians." (Pl. Mem. at 27) (formatting omitted, *sic* throughout). But because she does not explain *why* the record compels a conclusion of listing-level disability at step three, the argument is waived. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones.").

restricted RFC, Méndez concludes she would have been found disabled at step five prior to January 25, 2006.

Residual functional capacity is an ultimate administrative finding reserved to the Commissioner, though medical opinions and other evidence are used to determine the nature and severity of impairments. 20 C.F.R. § 404.1527(e)(2) (2011).[2] The Commissioner "will not give any special significance to the source of an opinion," even a medical source, on such ultimate findings. § 404.1527(e)(3); see SSR 96-5p, 1996 SSR LEXIS 2, 1996 WL 374183 (summarizing distinction between administrative findings and medical source opinions). Nonetheless, among medical opinions, those of treating sources are generally entitled to "controlling weight"; while the Commissioner may choose to give lesser weight to a treating source, he must "always give good reasons" when doing so. §§ 404.1527(d); see Roman-Roman v. Comm'r, 114 Fed. App'x 410, 411-12 (1st Cir. 2004) (citing Rodríguez Pagán, 819 F.2d at 2-3). Read together, these regulations mean that "[w]here an ALJ's RFC assessment is at odds with a medical source opinion, he must explain his reasons for disregarding that opinion." Costa v. Astrue, No. 1:09-cv-441-JL, 2010 U.S. Dist. LEXIS 121357 at *24, 2010 WL 4365868 at *7 (D.N.H. Nov. 3, 2010) (citing § 404.1527(d)(2); SSR 96-8p, 1996 SSR LEXIS 5 at *20, 1996 WL 374184 at *7; Marshall v. Astrue, No. 08-cv-147-JD, 2008 U.S. Dist. LEXIS 106092 at **10-11, 2008 WL 5396295 at *4 (D.N.H. Dec. 22, 2008)).

Here, the ALJ appears to pivot his reasoning on whether Méndez's "statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms" were supported by objective medical evidence, finding that Dr. Caro's report on January 25, 2006 indicated a turn for the worse. (See Tr. 26-27). However, as Méndez correctly points out, the ALJ's opinion

---

[2] Recent rulemaking reorganized this section. See 77 FR 10651-01 (Feb. 23, 2012). As the Appeals Council denial of review occurred in 2011, I apply the regulation as it was codified at the time.

does not address the findings expressed in Dr. Malavé's reports, which assertedly relate back to April 2005, and thus may predate Dr. Caro's assessment. The Commissioner's brief posits various rationales that would justify a decision to give less weight to Dr. Malavé's reports. (See Def. Mem. at 9-11). However, the ALJ's terse analysis does not reflect that any such weighing happened here. See SSR 96-8p, 1996 SSR LEXIS 5 at *20, 1996 WL 374184 at *7 ("The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.").

I do not suggest how the medical opinions in this case should be weighed, as that is a judgment for the Commissioner in the first instance. But the ALJ's failure to show that he gave those opinions due consideration and resolved any conflicts among them means that the Commissioner's RFC determination is deficient under the governing statute and regulations. Accordingly, the Commissioner's finding that Méndez was not disabled prior to January 25, 2006 is not supported by substantial evidence, and must be vacated.

## CONCLUSION

For the foregoing reasons, the decision of the Commissioner is **VACATED**, and the matter is **REMANDED** for further consideration of whether Nélida Méndez-Soto was disabled between June 4, 2004 and January 25, 2006.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 11th day of December, 2012.

*S/Bruce J. McGiverin*
BRUCE J. McGIVERIN
United States Magistrate Judge